**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

No. 01-1157

PAUL GIOVANNI GRAHAM,

Defendant - Appellant.

ORDER

August 29, 2002

Before **LUCERO** and **ANDERSON**, Circuit Judges, and **BROWN**[*], District Judge.

Appellant's petition for rehearing is denied.

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service as required by Fed. R. App. P. 35. As no member of the panel and no judge in regular active service on the court requested that the court be polled, the suggestion is also denied.

---

[*]The Honorable Wesley E. Brown, District Judge, United States District Court for the District of Kansas, sitting by designation.

Appellee's motion to publish the order and judgment is granted. The order and judgment filed on July 10, 2002, shall be published. The published opinion is attached to this order.

Entered for the Court
PATRICK FISHER, Clerk


Deputy Clerk

F I L E D
United States Court of Appeals
Tenth Circuit

JUL 10 2002

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

PAUL GIOVANNI GRAHAM,

Defendant - Appellant.

No. 01-1157

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. No. 00-CR-277-B)

Paul Grant, Englewood, Colorado, for Appellant.

Gregory Goldberg, Assistant United States Attorney (John W. Suthers, United States Attorney, Sean Connelly and Joseph Mackey, Assistant United States Attorneys, on the brief), Denver, Colorado, for Plaintiff - Appellee.

Before **LUCERO** and **ANDERSON**, Circuit Judges, and **BROWN,**[*] District Judge.

**ANDERSON**, Circuit Judge.

---

[*]The Honorable Wesley E. Brown, District Judge, United States District Court for the District of Kansas, sitting by designation.

Defendant Paul Giovanni Graham ("Graham") appeals from his conviction on three counts of "engag[ing] in the business of . . . dealing in explosive materials without a licence," in violation of 18 U.S.C. § 842(a)(1). We reverse in part and affirm in part.

**FACTS**

The evidence at trial, viewed in the light most favorable to the government, established the following facts:

In June 1999 Detective Kirk McIntosh ("Mack") was involved in an undercover investigation of a militia-type organization ("Organization"). On or about June 19, 1999, Mack attended Organization training exercises held in Park County, Colorado. Graham participated in these exercises. Mack observed Graham explode devices similar to M280 firecrackers, which Graham referred to as "quarter stickers." Tr. of Trial Proceedings at 32, R. Vol. 4. According to Mack, Graham made a comment to the effect "that he had a source for [the M280 devices] and he could get more of them." Id. Based on this comment, Mack decided to approach Graham about whether he would sell him some of the devices.

On or about June 30, 1999, Mack went to Front Range Surplus Store ("Store"), a business owned and operated by Graham. While at the Store, Mack asked Graham if "he was able to get any more of the quarter stickers that we had seen on the exercise in Park County." Id. at 33. Graham indicated that he had nineteen of the devices left and that he

- 2 -

would sell them to Mack for $7 a piece. Mack purchased ten of the devices, giving Graham $70 cash which Graham placed in his pocket.

During this transaction Mack inquired into whether or not the devices were waterproof and could be used for fishing purposes. According to Mack, Graham responded that they were not, but indicated that "his manufacturer" could custom make the devices if necessary and that Graham himself was having "some custom ones made." Id. at 37. Mack testified that although he did not make a specific request for any future devices, Graham "left it open that [Mack] could pretty much make any request and that his supplier would probably grant it." Id. at 49.

Thereafter John Kronfeld, a cooperating witness for the FBI, was enlisted to assist with the investigation and conduct additional controlled buys from Graham. Kronfeld first approached Graham at a survival show on or about January 28, 2000. He introduced himself as Mack's associate, and inquired into whether they could get more of the devices. Graham responded positively, indicating his willingness to deal with Kronfeld.

Kronfeld met with Graham at the Store on or about February 22, 2000, at which time the two agreed that Kronfeld would purchase fifty of the devices at a cost of $11.50 a piece. The sale was completed on February 25, 2000, when Kronfeld returned to the Store to pick up the devices. During this meeting Graham referred to the devices as "extension cords" and told Kronfeld to pick them up in the back of the Store because he did not want them going out of the Store itself. Kronfeld paid Graham $575 cash for the

devices, which Graham again placed in his pocket. Kronfeld then proceeded out to the back of the Store where he found the devices in a box labeled "extension cords."

The next transaction occurred on or about March 20, 2000. Graham agreed to sell Kronfeld fifty more devices for $11.50 a piece. The procedure was essentially the same. When Kronfeld arrived at the Store he paid Graham $575 cash which Graham again placed in his pocket. Graham again referred to the devices as "extension cords," and Kronfeld again found the devices in a box out behind the back of the Store.

The final transaction occurred on or about May 30, 2000. As with the previous transactions, Kronfeld agreed to purchase fifty devices for $11.50 a piece. When Kronfeld arrived at the Store he paid Graham $575 cash which Graham again placed in his pocket. Graham then informed Kronfeld that he only had twenty-seven or twenty-eight of the devices on hand, but that the manufacturer was making more to be picked up in a few days. Kronfeld left with the twenty-seven or twenty-eight devices which Graham again referred to as "extension cords," and which Kronfeld again found in a box behind the Store.

After this final transaction, Kronfeld discussed with Graham, via e-mail and telephone, the possibility of ordering 1000 more devices in five increments of 200. During these conversations Graham indicated his continued willingness to engage in

future transactions, but told Kronfeld that the price might be higher because he had a new manufacturer.[1]

On or about June 14, 2000, federal officers executed a search warrant at the Store. During the search, officers found approximately twenty-five devices which were apparently intended to fulfill the balance owed Kronfeld on the May 2000 transaction.

It is undisputed that Graham obtained all of the devices he sold to Mack and Kronfeld from the same manufacturer, and that he paid the manufacturer approximately $6.50 a piece for the devices. It is also undisputed that Graham made approximately $755 on the four transactions (approximately $5 on the initial transaction with Mack and approximately $250 on each of the transactions with Kronfeld). The profits were apparently donated to the Organization.[2]

---

[1]Graham contended at trial that he lied about the new manufacturer because he was scared of Kronfeld and wanted to find a way out of participating in further transactions. The jury was apparently unpersuaded by this testimony. See generally United States v. Edmonson, 962 F.2d 1535, 1547-48 (10th Cir. 1992) ("[T]he evidence may be sufficient even though it does not exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion of guilt [.] A jury is free to choose among reasonable constructions of evidence.") (internal quotations omitted).

[2]There was a dispute at trial about how Graham came to profit on the transactions in the first place, and what he actually did with the money. Graham contended that he took a profit only at the insistence of Kronfeld and that the profit was always intended as a donation to the Organization. He further testified that, pursuant to Kronfeld's orders, all of the money was used to further Organization activities. Kronfeld admitted that the topic of a donation to the Organization was discussed, but denied insisting on such. According to Special Agent Mark Holstlaw, Graham confessed during the search of the Store that although a portion of the money went to the Organization, a portion also "went to his business" and "to the Young Marine program." Tr. of Trial Proceedings at 127, R. Vol. 4. We find this factual dispute irrelevant to our analysis. See infra note 9.

## PROCEDURAL BACKGROUND

Graham was indicted on four counts, each alleging that he "knowingly and unlawfully engaged in the business of . . . dealing in explosive materials . . . in violation of Title 18, United States Code, Section 842(a)(1)." Indictment at 1-2, R. Vol. I, Doc. 1. Each count was based entirely on one of the four separate transactions described above.

Prior to trial, Graham unsuccessfully moved to dismiss the indictment, asserting that section 842(a)(1) violated his constitutional rights under the Second, Fifth, Ninth and Tenth Amendments. At trial, Graham unsuccessfully moved for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(a), asserting that the government failed to present evidence sufficient to prove its case beyond a reasonable doubt.[3] Graham's motion in this regard was based entirely on his assertion that the term "engage[] in the business" in section 842(a)(1) requires proof that the defendant engaged in the sale of explosives as his primary business, or for profit as a means of sustaining his livelihood.

At the conclusion of the trial, the jury found Graham guilty with respect to the three counts involving the transactions with Kronfeld, but found him not guilty with respect to the one count involving the initial transaction with Mack. Graham thereafter filed a post-trial motion for a judgment of acquittal, reasserting his argument that the evidence presented at trial was insufficient to sustain the conviction, and arguing for the

---

[3]This motion was initially raised and denied at the conclusion of the government's case-in-chief, and was also renewed without success at the end of the presentation of the evidence, before the jury deliberated.

first time that the three separate convictions were multiplicitous because "the government charged each isolated transaction as a separate offense." Def.'s Post-Trial Mot. for J. of Acquittal at 7, R. Vol. I, Doc. 97. The district court denied the motion, without any discussion of Graham's multiplicity claims. The district court thereafter sentenced Graham to three concurrent eight-month terms of imprisonment, followed by three concurrent three-year terms of supervised release, and ordered Graham to pay three separate $100 special assessments.

## DISCUSSION

On appeal, Graham contends that there was insufficient evidence to sustain his convictions, and that section 842(a)(1) is unconstitutional because it is void for vagueness and violates his rights under the Second, Fifth, Ninth and Tenth Amendments. We address each of his contentions in turn.

## I. Sufficiency of the Evidence

Graham's sufficiency of the evidence argument actually consists of two separate contentions. First, he asserts that the government improperly charged him with a separate count for each of the four separate transactions, rendering his convictions multiplicitous. Second, he asserts that a conviction under section 842(a)(1) requires proof that the defendant sold explosives as a primary business or for the sole purpose of making a profit

to sustain his livelihood, and that the evidence presented at trial does not establish this required element. For the reasons discussed below, we agree that the convictions were multiplicitous and that Graham can be convicted on only one count but reject his argument that the evidence was insufficient to support a conviction on that single count.

A.    Multiplicity

"Multiplicitous counts–those which are based on the same criminal behavior–are improper because they allow multiple punishments for a single criminal offense." United States v. McIntosh, 124 F.3d 1330, 1336 (10th Cir. 1997). We ordinarily review claims of multiplicity de novo, id., but where a defendant fails to raise the issue in a pre-trial motion, as Graham did in this case, "we review only for plain error." Id. "Under the plain error standard, [Graham] must show clear or obvious error that affected his substantial rights and seriously affected the integrity of the judicial proceedings." United States v. Battle, 289 F.3d 661, 669 (10th Cir. 2002).

Graham contends that the government erred in "charg[ing] each isolated transaction as a separate offense," Appellant's Br. at 19, because each transaction standing alone "could not constitute the pattern of repeated commercial activity necessary to show he engaged in the business" of dealing explosives. Id. at 10-11. The government essentially concedes this point, admitting that the statute at issue punishes continuing conduct rather than separate offenses, see Appellee's Br. at 16 (conceding that the "'gist

of the offense is carrying on the business . . . and not the sale . . . itself'") (quoting Bush v. United States, 218 F.2d 223-24 (10th Cir. 1954)), and that the Supreme Court therefore allows only one punishment:

> "The test is whether the individual acts are prohibited, or the course of [conduct] which they constitute. If the former, then each act is punishable separately. If the latter, there can be but one penalty."

Id. at 15 (quoting Blockburger v. United States, 284 U.S. 299, 302 (1932)).

We have no problem concluding, particularly in light of the government's concession, that the multiple charges and convictions in this case were plainly erroneous, and that on the facts of this case it would affect Graham's rights and substantially undermine the integrity of the judicial proceedings if we allowed him to receive three punishments for the same offense. Accordingly, we remand with instructions that the district court vacate two of Graham's counts of conviction, along with their concurrent sentences. See McIntosh, 124 F.3d at 1337; see also Rutledge v. United States, 517 U.S. 292, 301-02 (1996) (holding that where multiplicitous convictions are found "the only remedy . . . is for the District Court . . . to exercise its discretion to vacate one of the underlying convictions as well as the concurrent sentence based upon it") (quotations omitted).

B. <u>Insufficient Evidence</u>

We now consider whether the evidence was sufficient to sustain Graham's remaining count of conviction. "The sufficiency of the evidence to support a criminal conviction is a question of law to be reviewed de novo." <u>United States v. Higgins</u>, 282 F.3d 1261, 1274 (10th Cir. 2002).

> We consider the sufficiency of the evidence in the light most favorable to the jury's verdict, and determine whether any rational trier of fact could have found, from the direct and circumstantial evidence presented to it, together with the reasonable inferences therefrom, the essential elements of the crime beyond a reasonable doubt.

<u>McIntosh</u>, 124 F.3d at 1334.

As discussed above, Graham admits that he sold explosive devices to Mack or Kronfeld on four different occasions, that he made money on these transactions, and that he did not have a license for such sales. His argument on appeal is simply that these facts do not prove that he was "engage[d] in the business" of dealing in explosives. Specifically, he contends that his actions in selling explosive devices to "friends" on four occasions, at their request, for a slight profit, did not establish that he was actually "engage[d] in the business" of selling explosives under the statute. We disagree.

Graham urges us to apply the definition of the term "engage[d] in the business" contained in an analogous statute prohibiting the distribution of firearms without a license:

> The term *engaged in the business* is not defined in th[e] statute dealing with explosive materials, in Chapter 40.

- 10 -

The term *engaged in the business* is defined in Chapter 44, which parallels the explosives statute . . . in many respects, and which deals with firearms. There, *engaged in the business* is defined to mean, as applied to a dealer in firearms, "a person who devotes time, attention and labor to [engaging in such activity] as a regular course of trade or business with the principle objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms."

Appellant's Br. at 14 (quoting 18 U.S.C. § 921(a)(21)(c)). Graham asserts that the district court erred in denying Graham's request to instruct the jury on this definition. We disagree.

The definition advocated by Graham was added to the firearms statute by Congress in 1986, to resolve a circuit split regarding the meaning of the term as it applies in the firearms statute.[4] While Congress had the power to simultaneously amend the explosives statute to contain the exact same definition (and may decide to do so in the future), it did not. Graham cites no case law applying this definition from the firearms statute in the context of the explosives statute, and we have indeed found no case law even interpreting

---

[4]See United States v. Swinton, 521 F.2d 1255, 1258-59 (10th Cir. 1975) (recognizing the existence of a circuit split on the definition of the term "engage[d] in the business" in the firearm statute and whether that term requires that a sale be for the purposes of "livelihood or profit") (citing United States v. Day, 476 F.2d 562 (6th Cir. 1973); United States v. Gross, 451 F.2d 1355 (7th Cir. 1971); United States v. Wilkening, 485 F.2d 234 (8th Cir. 1973)). See also Firearms Owners' Protection Act, H. Rep. 99-495 at 12 (1986), reprinted in 1986 U.S.C.C.A.N. 1327, 1338 (1986) (noting that "Courts have not been unanimous regarding the question whether a profit motive is an essential ingredient in determining if one is 'engaged in the business' of firearms" and that a principal feature of the amendment was to more clearly define who is engaged in the business and thus needs a license).

the scope of the term "engage[d] in the business" as it applies in the explosives statute. Accordingly, we reject Graham's invitation to unilaterally amend the explosives statute by applying the definition of "engage[d] in the business" now found in the amended firearms statute. See Christner v. Poudre Valley Co-op. Ass'n., 235 F.2d 946, 950 (10th Cir. 1956) ("Courts should confine themselves to the construction of a statute as it is written and not attempt to supply omissions or otherwise amend or change the law under the guise of construction.")

As correctly noted by the district court, "[w]hen a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993). See also United States v. Hill, 197 F.3d 436, 444 (10th Cir. 1999). "Where the will of Congress 'has been expressed in reasonably plain terms, that language must ordinarily be regarded as conclusive.'" Chickasaw Nation v. United States, 208 F.3d 871, 878 (10th Cir. 2000) (quoting Griffin v. Oceanic Contractors, Inc., 458 U.S. 564, 570 (1982)) (further quotation omitted). "'In ascertaining the plain meaning of [a] statute, [we] must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.'" Id. (quoting K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 291 (1988)).

The term "engage" is commonly defined as "to occupy or involve oneself; take part; be active." Webster's New World College Dictionary ("Webster's") at 450 (3rd ed. 1997). Webster's defines "business" as "the buying and selling of commodities and

- 12 -

services; commerce; trade." Webster's at 189. Applying these definitions, a person would be "engage[d] in the business" of dealing in explosives under section 842(a)(1) if he "take[s] part" in, "occup[ies] or involve[s him]self," or is otherwise "active" in the "buying and selling" or "trad[ing]" of explosives in "commerce." Stated another way, one is guilty of "engag[ing] in the business" of dealing in explosives under the statute if one has explosives "on hand or is ready and able to procure them for the purpose of selling them from time to time to such persons as might be accepted as customers." United States v. Carter, 801 F.2d 78, 82 (2nd Cir. 1986) (quotation omitted). See also United States v. Hamilton, 689 F.2d 1262, 1272 (6th Cir. 1983) (applying firearm statute prior to amendment); United States v. Jackson, 352 F. Supp. 672, 674 (S.D. Ohio 1972) (same), quoted in Swinton, 521 F.2d at 1258. Cf. Bush, 218 F.2d at 224 (concluding that the defendant was "carrying on [in] the business of a retail liquor dealer" where he made sales to an undercover agent "without any questions or hesitancy" and "appeared ready and willing to sell to anyone").

Graham responds that this definition is too broad, and that even if we refuse to adopt the exact definition now contained in the firearm statute, we should still define the term to require some showing that the defendant sold explosives as his primary occupation with the primary intent of making a profit to support his personal livelihood. Appellant's Br. at 16. Although his position has some support in alternative dictionary definitions of the term "business," see Webster's at 189 (defining "business" as "one's work, occupation

- 13 -

or profession"),[5] and in analogous case law interpreting the firearm statute prior to its 1986 amendment, see, e.g., Gross, 451 F.2d at 1357 (defining the word "business" to mean "that which occupies time, attention and labor for the purpose of livelihood or profit"),[6] we nonetheless reject it.

We conclude that the intent to profit is not a required element of the offense, cf. Swinton, 521 F.2d at 1258 (applying the firearm statute prior to its 1986 amendment and holding that it "does not require that the Government establish that a person engaged in the business of dealing in firearms make a profit, even though the 'dealing' activity requires time, attention and effort"), and that the broad definition of the term "business" articulated above is the most consistent with the broad corrective and remedial purposes of the explosives statute:[7]

---

[5]See also Black's Law Dictionary at 198 (6th ed. 1990) (defining business as "[e]mployment, occupation, profession, or commercial activity engaged in for gain or livelihood").

[6]See also Day, 476 F.2d at 567 (defining "business" to mean the occupying of time, attention and labor for the purpose of livelihood or profit); United States v. Van Buren, 593 F.2d 125, 126 (9th Cir. 1979) (recognizing that "where transactions of sale, purchase or exchange of firearms are regularly entered into in expectation of profit, the conduct amounts to engaging in business").

[7]"It is our primary task in interpreting statutes to determine congressional intent, using traditional tools of statutory construction." St. Charles Invest. Co. v. Commissioner, 232 F.3d 773, 776 (10th Cir. 2000) (quotations omitted). Where the plain language of the statute leaves intent in doubt, "we look to the legislative history and the underlying public policy of the statute." United States v. LaHue, 170 F.3d 1026, 1028 (10th Cir. 1999).

[The explosives statue] . . . establishes Federal controls over the interstate . . . commerce of explosives and is designed to assist the States to more effectively regulate the sale, transfer and other disposition of explosives within their borders.  The [statute] establishes a system of Federal licenses and permits; licenses are required of <u>all</u> explosive manufacturers, importers and dealers; and permits are required of <u>all</u> users who depend on interstate commerce to obtain explosives. . . .  [T]he purpose of this [statute] is to protect interstate and foreign commerce by reducing the hazards to persons and property associated with the misuse of explosives without placing unnecessary restrictions on the lawful use of explosives.

<u>Organized Crime Control Act of 1970</u>, H. Rep. 91-1549 (1970), <u>reprinted</u> <u>in</u> 1970 U.S.C.C.A.N. 4007, 4011, 4040 (emphasis added).  Our conclusion in this regard is buttressed by the majority of analogous case law applying the firearm statute, both before and after the 1986 amendment, concluding that a defendant need not be shown to have acted with profit-making intent or engaged in the sale of firearms as his primary business in order to be convicted under the statute.  <u>See</u> <u>United States v. Murphy</u>, 852 F.2d 1, 8 (1st Cir. 1988) (upholding conviction under current version of firearm statute despite the fact that defendant was not technically "in the business for profit"); <u>Carter</u>, 801 F.2d at 81-82 ("The government need not prove that dealing in firearms was the defendant's primary business.") (quotation omitted); <u>United States v. Shirling</u>, 572 F.2d 532, 534 (5th Cir. 1978) (holding that a profit motive is not a prerequisite for a conviction under the firearm statute); <u>United States v. Obiechie</u>, 825 F. Supp. 1335, 1337 (N.D. Ill. 1993) (holding that even under amended version of firearm statute "[t]he government does not have to show . . . that defendant's primary business was dealing in firearms or that he made a profit from such dealing"), <u>vacated on other grounds</u>, 38 F.3d 309 (7th Cir. 1994).

Applying our definition in this case, the evidence was clearly sufficient to sustain Graham's conviction. As noted previously, the evidence discloses that Graham voluntarily and without hesitation sold explosive devices to both Mack and Kronfeld on four separate occasions,[8] that he had the explosives on hand or could readily procure them as they were needed by his selected customers, and that he expressed a general willingness to participate in even larger transactions in the future. The evidence further supports the conclusion that Graham's participation in these sales was more than just a hobby, and that he sold the devices for more than it cost to procure them and complete the transaction, thereby making a profit.[9] Finally, the fact that Graham sold to Mack and Kronfeld shortly after he met them reasonably supports the conclusion that he was ready and willing to sell to anyone.

---

[8]The Government asserted at oral argument, and Graham essentially conceded, that even if the Indictment originally contained only one charge under section 842(a)(1), it would have included all four of the transactions in question, and that the facts surrounding all four of the transactions would have certainly been admitted into evidence to prove a continuous course of conduct. Thus, despite our holding that Graham can be convicted on only one count in this case, we appropriately consider all of the evidence submitted at trial regarding all four of the relevant transactions. in determining whether the evidence was sufficient to sustain that sole count.

[9]Although we find the fact of a profit persuasive to our overall analysis, it is not, as noted above, a required element. We further note that it is irrelevant to our analysis whether the profit was kept for Graham's personal benefit or donated to the Organization. Even if we assume that Graham donated the money to the Organization, and even if we assume that this was done at Kronfeld's insistence, we believe that a jury could still reasonably conclude that Graham readily agreed to sell the devices in order to further his strong personal interests in maintaining the Organization, and that he was therefore actively and purposefully engaging in the business of selling explosives.

Contrary to Graham's assertions on appeal, the fact that the transactions were solicited by the undercover agents, rather than Graham himself, is inapposite. Cf. Carter, 801 F.2d at 80-81 (upholding conviction under firearms statute against sufficiency challenge despite the fact that undercover agent technically initiated all of the sales in question). The evidence was sufficient to allow a reasonable jury to conclude that regardless of who made the initial contact, Graham was nonetheless ready, willing and able to participate in the transactions. Indeed, the evidence demonstrated that it was Graham himself who suggested during the June 19 exercises that he could get the devices for his friends in the Organization, and that this suggestion led Mack to approach him in the first place. Likewise, we find it irrelevant that Graham was not actively advertising or soliciting new customers. Cf. Jackson, 352 F. Supp. at 676 (finding defendant guilty of selling firearms without a license despite the fact that he "had no place of business [and] did not advertise in any way, including the Yellow Pages"). It is common knowledge that businessmen frequently obtain customers by word-of-mouth recommendations, or by cultivating contacts they have in trade or other organizations to which they belong, and the jury could reasonably conclude that Graham did just that.

In sum, we hold that the evidence in this case was sufficient to allow a reasonable jury to find Graham guilty beyond a reasonable doubt on one count of "engag[ing] in the business of dealing in explosive[s]" under 18 U.S.C. § 842(a)(1).

**II.    Constitutionality**

Graham also asserts that section 842(a)(1) is unconstitutional.  In this regard, he first contends that the statute is unconstitutionally vague and ambiguous regarding the undefined use of the term "engage[d] in the business."  Appellant's Br. at 11.  Second, he contends that the statute "conflicts with rights protected by the Second, Fifth, Ninth and Tenth Amendments to the United States Constitution."  Appellant's Br. at 23.  "We review constitutional challenges to statutes de novo."  United States v. Haney, 264 F.3d 1161, 1163-64 (10th Cir. 2001).

**A.    Void for Vagueness**

"The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  United States v. Gaudreau, 860 F.2d 357, 359 (10th Cir. 1989).  Put another way, to prevail on his claim Graham must demonstrate (1) that ordinary people cannot understand what conduct the statute prohibits, and (2) that the statute does not establish minimal guidelines to govern law enforcement.  Moreover, because Graham's vagueness challenge does not implicate a First Amendment interest or any other constitutional right, see infra Section II-B, he must show that the statute is vague as applied in this case.  See Gaudreau, 860 F.2d at 360 (noting that a statute may be

challenged "on its face" only where "it threatens to chill constitutionally protected conduct, especially conduct protected by the First Amendment" or is considered on "pre-enforcement review") (footnote omitted).

We have already concluded the undefined term "engage[d] in the business" should be given its "plain and ordinary" meaning, and we conclude further that there was no need for Congress to specifically define the term. We determined above that the statute generally prohibits a defendant from engaging in a course of conduct through which he actively and continually sells regulated explosives without a license. Contrary to Graham's suggestions on appeal, the fact that there may be variations in the ordinary meaning to the term "business" does not render the term vague for constitutional purposes. See United States v. Davis, 36 F.3d 1424, 1434 (9th Cir. 1994) ("Just because other courts of appeals differ in their definition of a term does not mean that the term is void for vagueness.") (quotation omitted). It is clear to us that section 842(a)(1) adequately "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1988) (citations omitted).

Graham responds by reasserting his multiplicity claim. Specifically, he contends that the very fact the jury was allowed to convict him of four separate offenses, rather than on one offense for a continuous course of conduct, demonstrates the statute is "incoherent"

- 19 -

and leads to arbitrary enforcement. We have already concluded that the statute clearly requires a course of conduct and that it was plain error to charge and convict the defendant on multiple counts. This error, however, stemmed entirely from the erroneous application of the clear statute, and not from vagueness or ambiguity inherent in the statute itself. Accordingly, we reject Graham's contention that the statute is unconstitutionally void for vagueness.

B.    Individual Constitutional Rights

Turning to Graham's final arguments on appeal, we reject his contention that section 842(a)(1) violates his constitutional rights guaranteed by the Second, Fifth, Ninth and Tenth Amendments.

With respect to his Second Amendment claim, Graham asserts that by banning the sale of the explosive devices, section 842(a)(1) unconstitutionally infringes upon his right to "keep and bear arms." U.S. Const. amend. II. Specifically, Graham asserts that the explosive devices at issue "have a common use in military training exercises," Appellant's Br. at 25-26, that there is an "individual right to participate in militia training exercises, and to keep and bear arms needed by a militaman," id. at 26, and that "[t]hese rights would mean little if he could not purchase or sell these arms." Id.

We have previously held that a federal weapons restriction "does not violate the Second Amendment unless it impairs the state's ability to maintain a well-regulated

militia," Haney, 264 F.3d at 1165, and that the right to bear arms is a collective rather than individual right. See United States v. Oakes, 564 F.2d 384, 387 (10th Cir. 1977). Accordingly, Graham must prove that "(1) he is part of a state militia; (2) the militia, and his participation therein, is 'well-regulated' by the state; (3) [the explosive devices] are used by that militia; and (4) his sale of the [explosives] was reasonably connected to his militia service." Haney, 264 F.3d at 1165 (emphasis added).

At the very least, Graham failed to prove that he was part of a state militia, or that his participation in the Organization was "well-regulated" by the state. The only evidence presented at trial established that while he was a member of the private Organization, the group had never been recognized, condoned or otherwise regulated by the state. The evidence further disclosed that the Governor of Colorado specifically denied Graham's request to "be commissioned as an officer in the Colorado state militia." Tr. of Trial Proceedings at 348, R. Vol. 5.

In any event, Second Amendment rights are subject to reasonable governmental restrictions. See United States v. Emerson, 270 F.3d 203, 273 (5th Cir. 2001) (Parker, J., concurring) ("[W]hatever the nature or parameters of the Second Amendment right, be it collective or individual, it is a right subject to reasonable regulation."). Cf. United States v. Baer, 235 F.3d 561, 564 (10th Cir. 2000) (recognizing that "federal legislation regulating the receipt and possession of firearms by felons does not trench upon any constitutionally protected liberties, including those guaranteed by the Second

Amendment," and that "the circuits have consistently upheld the constitutionality of federal weapons regulations . . . absent evidence that they in any way affect the maintenance of a well regulated militia") (quotation omitted). Thus, even if we assume that Graham could have established all of the required elements, we would nevertheless conclude that the licensing requirements contained in the explosive statute are reasonable and sufficiently tailored to serve the purpose of protecting the public from dangerous explosives. The statute does not absolutely prohibit the sale, use, possession or distribution of explosive devices, but merely requires those wishing to engage in such activities to obtain licenses and/or permits before doing so, in order to facilitate the safe handling, storage and transportation of such explosives.

Finally, we decline to consider Graham's remaining constitutional contentions, i.e., that the statute violates his Fifth, Ninth and Tenth Amendment rights. He failed to provide any actual argument or legal authority in support of these contentions on appeal, and we will not craft his arguments for him. See Perry v. Woodward, 199 F.3d 1126, 1141 n. 13 (10th Cir. 1999) (noting that this court "will not craft a party's arguments for him"); Brownlee v. Lear Siegler Mgmt. Servs. Corp., 15 F.3d 976, 977-78 (10th Cir. 1994) (noting that conclusory references to district court error without adequate citation to supporting authority is insufficient to preserve the argument on appeal); Primas v. City of Okla. City, 958 F.2d 1506, 1511 (10th Cir. 1992) (stating that party has a duty to cite authority for any argument raised); American Airlines v. Christensen, 967 F.2d 410, 415 n.

- 22 -

8 (10th Cir. 1992) (concluding that mere statement regarding trial court error "without advancing reasoned argument as to the grounds for appeal" is insufficient).

## CONCLUSION

Based on the foregoing, we REMAND with instructions for the district court to vacate two of Graham's three convictions under 18 U.S.C. § 842(a)(1), and AFFIRM the remaining count of conviction.