# United States Court of Appeals
## For the Eighth Circuit

_____

No. 15-3721

_____

United States of America

*Plaintiff - Appellee*

v.

Jeffrey Belmont

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: May 19, 2016
Filed: August 8, 2016

_____

Before WOLLMAN, LOKEN, and BENTON, Circuit Judges.

_____

BENTON, Circuit Judge.

Jeffrey L. Belmont pled guilty to manufacturing explosives in violation of 18 U.S.C. §§ 842(a)(1), 844(a)(1). He reserved the right to appeal the meaning of "engage in the business" in § 842(a)(1). The district court[1] sentenced him to six

---

[1]The Honorable Joseph F. Bataillon, United States District Judge for the District of Nebraska.

months' imprisonment, two years' supervised release, and a fine of $100. Belmont appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

A search of a shed on Belmont's property yielded 36 completed M-series improvised explosive devices (IEDs)—found next to a hydraulic press located on a work bench—and 28 partially completed IEDs. The completed IEDs were functional; the partially completed IEDs lacked only fuses. All the IEDs—commonly called M80s—had over 130 milligrams of an explosive material. According to the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF), all the IEDs had a perchlorate explosive mixture of potassium perchlorate and aluminum powder—the primary ingredients for flash powder, a covered material under the explosives statute. *See* **18 U.S.C. § 841(d)**; **27 C.F.R. § 555.23**. A search of Belmont's home yielded over 1,000 pounds of potassium perchlorate, over 1,000 pounds of aluminum powder, and large spools of fuse. Also found in the home: (1) various invoices and shipping documents for small quantities of tubes and end caps, addressed to Belmont; (2) over 1,000 candy-striped cardboard tubes of various sizes, most with one end cap; and (3) many sizes of end caps.

Other items in Belmont's shed included: (a) metal mixing bowls, funnels, and sifting screens; (b) a white trash bag with 45 candy-striped cardboard tubes, measuring 6" x 1.25" with plastic end caps on one end; (c) a cardboard box with 765 candy-striped cardboard tubes of assorted sizes; (d) another box with 53 red cardboard tubes 2.5" x 1" in size; (e) 104 red cardboard tubes 2" x 9/16" in size; (f) a bucket with 85 red cardboard tubes 2.5" x 1" in size, and two silver cardboard tubes ½" x 1.25" with hobby fuse in each tube, plus one red-and-white tube 3" x 5" in size, and various paper end plugs; (g) a plastic trash bag with paper and plastic end caps and plugs; (h) a plastic container with hydraulic press instructions, pyrotechnic recipes, a small metal bowl, and other tools and items; and (i) a powder measuring kit. With all these components and ingredients, Belmont had the ability to manufacture around 2,000 IEDs.

Belmont was charged with engaging in the business of manufacturing explosive materials without a license: "It shall be unlawful for any person—(1) to engage in the business of importing, manufacturing, or dealing in explosive materials without a license issued under this chapter." **18 U.S.C. § 842(a)(1)** ("the explosives statute"). Belmont did not have a license to manufacture explosives. The government found no historical evidence he sold any explosive materials or items. However, at the plea hearing, Belmont admitted traveling to conventions to sell "components for hobbyists, pieces—cardboard tubes, end caps, ball shells, rocket tubes, just anything pyrotechnic-related that wasn't explosive." Belmont also admitted selling the chemical components at conventions and by mail-order. The presentence investigation report details an explosion at a Kansas City home that caused critical injuries and one death. The occupants of the home were manufacturing IEDs from chemical powders they purchased from Belmont. The presentence report also details a website, "pastimepyrochemicals.com," run by A Whole New Look Inc., which Belmont operated. The site sold fuels, oxidizers, additives, binders, stabilizers, and color agents associated with explosive-making.

Before pleading guilty, Belmont argued that under the explosives statute, he would be in the business of manufacturing explosives only if it occupied his time, attention, and labor for the purpose of livelihood or profit. Belmont asserted he was manufacturing fireworks as a hobby, not for livelihood or profit. The district court found that at trial, the government would "not have to prove that the defendant intended to sell or seek livelihood or profit from the explosive manufacturing activities." Belmont then pled guilty, reserving the right to appeal the court's interpretation of the explosives statute.

This court reviews de novo the district court's interpretation of the statute. *United States v. Williams*, 136 F.3d 547, 550 (8th Cir. 1998). This court assumes that "Congress intended to adopt the plain meaning or common understanding of the words used in a statute." *United States v. Petruk*, 781 F.3d 438, 441 (8th Cir. 2015).

-3-

Belmont urges this court to interpret "engage in the business" as it interpreted the same phrase in the Gun Control Act. *See **United States v. Perkins***, 633 F.2d 856 (8th Cir. 1981), *interpreting* **18 U.S.C. § 922(a)(1)** (1968). The Gun Control Act prohibited any person "except a licensed importer, licensed manufacturer, or licensed dealer, to engage in the business of importing, manufacturing, or dealing in firearms . . . ." **§ 922(a)(1)** (1968). Until 1986, the Gun Control Act did not define the phrase "engage in the business." Before 1986, this court held that "the proper focus in ascertaining 'business' is whether the pursuit 'occupies time, attention and labor for the purpose of livelihood or profit' by the person and not merely the number of sales." ***Perkins***, 633 F.2d at 860. *Contra, e.g.*, **United States v. Swinton**, 521 F.2d 1255, 1258 (10th Cir. 1975) (holding § 922(a)(1) "does not require that the Government establish that a person engaged in the business of dealing in firearms make a profit" and describing the circuit split). In 1986, Congress resolved the circuit split, defining "engage in the business" in the Gun Control Act to require a livelihood or profit motive. *See* **§ 921(a)(21)(A)**. ("The term 'engaged in the business' means . . . as applied to a manufacturer of firearms, a person who devotes time, attention, and labor to manufacturing firearms as a regular course of trade or business with the principal objective of livelihood and profit through the sale or distribution of the firearms manufactured").

Belmont contends that the *Perkins* definition—"for the purpose of livelihood or profit"—should control the explosives statute. However, Congress—in adopting (more than) the *Perkins* definition—clarified that it amended the Gun Control Act because of Second Amendment concerns. Congress said that the "Firearms Owners' Protection Act" was "additional legislation to correct existing firearms statutes and enforcement policies" due to "the rights of citizens . . . to keep and bear arms under the second amendment to the United States Constitution." **Firearms Owners' Protection Act**, Pub. L. 99-308, § 1(b)(1)-(2), 100 Stat. 449 (May 19, 1986). The Second Amendment does not protect manufacturing explosives. *See **United States v. Graham***, 305 F.3d 1094, 1106 (10th Cir. 2002) (rejecting the "contention that section

842(a)(1) [the explosives statute] violates his constitutional rights guaranteed" by the Second Amendment).  *See generally* **District of Columbia v. Heller**, 554 U.S. 570, 627 (2008) (The "sorts of weapons protected were those 'in common use at the time.' . . . . We think that limitation is fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'").  Importantly, in the 1986 Firearms Owners' Protection Act, Congress did not amend the explosives statute—a statute in the Organized Crime Control Act of 1970.  This court's interpretation of the Gun Control Act in the *Perkins* case does not control the meaning of the explosives statute's phrase "engage in the business."

The Tenth Circuit has interpreted "engage in the business" in the explosives statute.  *See* **Graham**, 305 F.3d at 1101-04.  A jury convicted Graham of engaging in the business of dealing in explosive materials without a license.  **Id.** at 1097, *citing* **§ 842(a)(1)**.  Graham argued that "engage in the business of . . . dealing" required the government to prove "that the defendant engaged in the sale of explosives as his primary business, or for profit as a means of sustaining his livelihood." **Id.** at 1099.  Graham urged the Tenth Circuit to adopt the Firearms Owners' Protection Act's definition.  **Id.** at 1101.  The court declined, concluding that "intent to profit is not a required element of the offense." **Id.** at 1103.  The Tenth Circuit held that "a person would be 'engage[d] in the business' of dealing in explosives under section 842(a)(1) if he 'take[s] part' in, 'occup[ies] or involve[s him]self,' or is otherwise 'active' in the 'buying and selling' or 'trad[ing]' of explosives in 'commerce.'" **Id.** at 1102.  "Stated another way, one is guilty of 'engag[ing] in the business' of dealing in explosives under the statute if one has explosives 'on hand or is ready and able to procure them for the purpose of selling them from time to time to such persons as might be accepted as customers.'" **Id.**  The Tenth Circuit found that this "broad definition of the term 'business' . . . is the most consistent with the broad corrective and remedial purposes of the explosives statute." **Id.** at 1103.

The Tenth Circuit's definition is supported by another section of the explosives statute (enacted in the same Act of Congress as § 842(a)(1)). *See* **Organized Crime Control Act of 1970**, Pub. L. 91-452, Title XI, § 1102(a), 84 Stat. 922, 952-53 (Oct. 15, 1970); **Homeland Security Act of 2002**, Pub L. 107-296, Title XI, 116 Stat. 2135 (Nov. 25, 2002); *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) ("It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'"). The explosives statute defines "Manufacturer" as "any person engaged in the business of manufacturing explosive materials for purposes of sale or distribution or for his own use." **18 U.S.C. § 841(h)**. By the definition of "Manufacturer," the explosives statute includes a person in the business of manufacturing explosives who does not sell them, but only distributes them. *See* **§ 841(n)** ("Distribute" means "sell, issue, give, transfer, or otherwise dispose of."). The statute does not require proof of an intent to seek livelihood or profit in order to prove a person engaged in the business of manufacturing explosives without a license.

Belmont also insists his manufacturing was a "hobby" not covered by the statute. He emphasizes the ATF's interpretation of § 841(h)'s "own use" language: "A manufacturer's license is required by persons engaged in the business of manufacturing explosive materials for sale, distribution, or for their own *business* use." **ATF Federal Explosives Law and Regulations 64 (2012)**, *available at* https://www.atf.gov/explosives/docs/publication-federal-explosives-laws-and-regulations-atf-p-54007/download (last visited Aug. 3, 2016) (emphasis added). *See also* **Appendix A** (listing authorities Belmont cites).

This court agrees that to engage in the business of manufacturing explosives, a person's manufacturing must relate to business, as it is commonly understood. *See Petruk*, 781 F.3d at 441 ("Congress intended to adopt the plain meaning or common understanding of the words used in a statute."). Under the explosives statute, a person is engaged in the business of manufacturing explosives by taking part in, occupying

-6-

or involving in, or are otherwise active in manufacturing for the purpose of selling, distributing, or for their own business use. *See Graham*, 305 F.3d at 1102; **§ 841(h)**. Stated another way, one engages in the business of manufacturing explosives if one has explosives "on hand or is ready and able to procure them for the purpose of selling [or distributing] them from time to time to such persons as might be accepted as customers [or for their own business use]." *See Graham*, 305 F.3d at 1102. This construction implements the explosives statute's purpose to strengthen federal regulation of explosives. *See United States v. Dawson*, 467 F.2d 668, 671 (8th Cir. 1972) (explaining that the explosives statute "represents a seriously conceived and comprehensive attempt by Congress to protect interstate and foreign commerce against disruption by reducing the hazards to persons and property associated with the misuse of explosive materials"). *Cf.* **ATF Ruling 75-31**, 1975 WL 28638 (Oct. 1975) (stating "the term 'engaged in the business' is not susceptible to a rigid definition," though "it is generally interpreted to imply an element of continuity or habitual practice as against a single act or occasional participation").

Based on his reading of the explosives statute, Belmont believes there was an insufficient factual basis for his guilty plea because the government did not offer proof he engaged in the business of manufacturing explosives for the purpose of livelihood or profit. Belmont also argues that there was an insufficient factual basis because the explosives statute does not prohibit manufacturing explosives as a hobby (when it is a personal, non-business use). Generally, a challenge to the legal sufficiency of an undisputed factual basis is a straightforward question of law, reviewed de novo. *United States v. Butler*, 637 F.3d 519, 521 (5th Cir. 2011). This court's "review of the factual basis for a guilty plea is limited. We ask only whether there was sufficient evidence before the district court upon which a court may reasonably determine that the defendant likely committed the offense." *United States v. Johnson*, 715 F.3d 1094, 1101 (8th Cir. 2013). "We have held that facts gathered from the prosecutor's summarization of the plea agreement and the language of the plea agreement itself,

a colloquy between the defendant and the district court, and the stipulated facts before the district court are sufficient to find a factual basis for a guilty plea." ***Id.***

First, as discussed, the government need not prove Belmont engaged in the business of manufacturing explosives for the purpose of livelihood or profit. Second, although Belmont asserts on appeal that he was manufacturing explosives for his own personal, non-business use, the district court, in its Order, stated, "The parties agreed at oral argument that this case does not involve any assertion that the explosives at issue were for personal use." The district court specifically found that "the government would not have to prove that the defendant intended *to sell* or seek livelihood or profit from the explosive manufacturing activities." (Emphasis added). Because the term "Manufacturer" includes manufacturing "for purposes of sale *or* distribution *or* his own [business] use," the district court correctly concluded the government need not prove the manufacturing was for the purpose of selling or seeking livelihood or profit—as the government may prove a person is engaged in the business of manufacturing for the purpose of distribution or own business use. *See* **§§ 841(h), (n)**.

Belmont had 36 completed IEDs, 28 partially-completed IEDs, over 1,000 pounds of potassium perchlorate, over 1,000 pounds of aluminum powder, large spools of fuse, and the materials listed in the second and third paragraphs of this opinion. These items were enough materials to manufacture around 2,000 IEDs. The sheer quantity of completed and partially completed IEDs (and materials) shows that Belmont was engaged in the business of manufacturing explosives. There was a sufficient factual basis for the guilty plea. The district court reasonably determined that Belmont likely committed the offense and did not err in accepting his guilty plea.

* * * * * * *

-8-

The judgment is affirmed.

Appendix A

**ATF Federal Explosives Law and Regulations 64 (2012)**, *available at* https://www.atf.gov/explosives/docs/publication-federal-explosives-laws-and-regulations-atf-p-54007/download (last visited Aug. 3, 2016) ("**37. When is a manufacturer's license required?** A manufacturer's license is required by persons engaged in the business of manufacturing explosive materials for sale, distribution, or for their own business use. For example, persons engaged in the business of providing a blasting service using explosives of their own manufacture would be required to have a manufacturer's license. Persons who manufacture explosives for their personal, non-business use are not required to have a manufacturer's license . . . .").

**Binary Explosives: Manufacturing**, *available at* https://www.atf.gov/explosives/binary-explosives (last visited Aug. 3, 2016) (expanding on examples of personal business use and stating that "business uses include manufacturing for use in commercial blasting applications, removing obstacles such as trees or rocks during construction, theatrical special effects, and for demonstration or product testing purposes.")

**ATF Letter No. 902030: GLB 07–0147 5400** (Mar. 22, 2007), *available at* http://mc-4071-273355444.us-east-1.elb.amazonaws.com/press/releases/2007/03/032207-interpretation-pyrotechnic-club-member-activities.html (last visited Aug. 3, 2016) ("A manufacturer's license is needed only by persons engaged in the business of manufacturing fireworks for Sale, distribution, or for a commercial use.").

**ATF Explosives Industry Newsletter, Bureau of Alcohol, Tobacco, Firearms and Explosives** (June 2011), *available at* https://www.atf.gov/file/56586/download (last

visited Aug. 3, 2016) (explaining that individuals "do not need a manufacturer's license if they are manufacturing black powder for their own personal, non-business use.").

**Explosives Newsletter** (June 1997), *available at* https://www.atf.gov/file/56491/download (last visited Aug. 3, 2016) (stating a "manufacturers [sic] license is needed only for persons who manufacture explosives for sale, distribution, or for business use").

**FBI Intelligence Bulletin 3** (March 5, 2013), *available at* https://info.publicintelligence.net/FBI-ExplodingTargets.pdf (last visited Aug. 3, 2016) (stating that persons "manufacturing explosives for their own personal, nonbusiness use only (e.g., personal target practice) are not required to have a federal explosives license (FEL) or permit.").

———————————————