**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**August 10, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ALVEREZ McCULLOUGH,

    Defendant-Appellant.

_____

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

JAMI MOSLEY,

    Defendant-Appellant.

No. 05-3270

No. 05-3280

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 04-CR-20006-01-02-JWL)**

---

Matthew M. Robinson of Robinson & Brandt, Cincinnati, Ohio, for Defendant-Appellant, Alverez McCullough.

Carl E. Cornwell, (Jessica J. Travis, with him on the brief), of Cornwell, Erickson, Travis, Breer & Scherff, Olathe, Kansas, for Defendant-Appellant, Jami Mosley.

Sheri P. McCracken, Assistant United States Attorney (Eric F. Melgren, United States Attorney, with her on the briefs), District of Kansas, Kansas City, Kansas, for Plaintiff-Appellee.

Before **BRISCOE, EBEL,** and **MURPHY**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Defendants Alvarez McCullough and Jami Mosley were convicted following a jury trial on various drug and weapons-related charges, and were sentenced to lengthy terms of imprisonment. Mosley now appeals her convictions, arguing (1) the evidence was insufficient to support her conspiracy conviction, (2) the jury's verdicts were inconsistent and the evidence was insufficient to support her conviction for maintaining a residence for the purpose of storing cocaine, and (3) her counts of conviction are multiplicitous. Mosley does not appeal her sentence. McCullough appeals both his convictions and sentence, arguing (1) the district court erred in denying his motion to suppress evidence, (2) the district court erred in denying his motion for new trial based upon newly discovered evidence, (3) the evidence was insufficient to support three of his convictions, and (4) the sentence imposed by the district court was unreasonable. We exercise jurisdiction pursuant to 28 U.S.C. § 1291, and affirm.

I.

Defendant Mosley is the owner of a residence located at 3244 Cleveland Avenue, in Kansas City, Kansas, which had a security system installed by ADT Security Services (ADT). At approximately 8:18 p.m. on June 9, 2003, ADT's monitoring center received

-2-

an alarm signal from the security system in Mosley's residence. An ADT representative placed a telephone call to the residence and an individual identifying herself as Heather Gordon answered. Gordon, however, was unable to provide the ADT representative with Mosley's personal identification code, so the ADT representative called the Kansas City, Kansas Police Department (KCKPD) at approximately 8:21 p.m. That call resulted in Officers Sandra Carrera and George Simms being dispatched to the residence.

At approximately 8:23 p.m, after Officers Carrera and Simms were dispatched, the security system at the residence was restored and automatically reset. In turn, an ADT representative called the KCKPD at approximately 8:26 p.m. to cancel the alarm call. Because official KCKPD policy does not permit a 911 operator to cancel an alarm call once officers have been dispatched to the scene, the 911 operator who received this second call from ADT did not report the call to either the police dispatcher or Officers Carrera and Simms.

Officer Carrera was the first to arrive at the residence. Upon her arrival, she observed a woman, later identified as Gordon, standing in the driveway and a man, later identified as Richard Cook, leaving from a sliding glass door that lead from the basement area of the home directly onto the driveway. According to Officer Carrera, Gordon and Cook "were grungy, dirty in nature," and looked "like probably they hadn't changed their clothes in a few days . . . ." Mosley App. at 333.

Gordon immediately approached Officer Carrera and stated that the setting off of the alarm was an accident. Officer Carrera, in response, asked Gordon if she and Cook

were the homeowners. Gordon stated "no," that she and Cook were working putting up a privacy fence at the house. Id. at 332. Gordon further stated that Cook, who was standing nearby observing the conversation and appearing disoriented, had some type of medical condition that prevented him from speaking. According to Officer Carrera, Gordon "just seemed nervous" and kept looking at Cook while Carrera was questioning her. Id. at 333. Officer Carrera asked Gordon and Cook for identification, but neither one had any. Officer Carrera then asked Gordon who the homeowners were and Gordon "sat there and couldn't recall their names and just had no idea who . . . the homeowners" were. Id. at 335. Gordon did, however, indicate that the alarm was false, that she had contacted the homeowner to obtain the alarm code, and that she had successfully reset the security system.

Officer Carrera informed Officer Simms, who had just arrived on the scene, that she was going to go inside the residence to check the alarm panel. Officer Carrera then asked Gordon to show her where the alarm panel was. Entering the house through the open front door of the main level, Gordon led Officer Carrera to the alarm panel, which was situated near the main floor kitchen area. Officer Carrera noted that a red, rather than a green, light appeared on the panel and that the display monitor was flashing "01/04," which indicated to her that there was still an active alarm covering the front door and motion detectors. Based upon these observations, Officer Carrera concluded that the alarm panel was still active, even though no sirens or beeps could be heard. According to Officer Carrera, this heightened, rather than alleviated, her suspicions.

-4-

Officer Carrera left the house and asked Gordon and Cook what business they had inside the residence. Again, Gordon did all of the talking, while Cook remained silent. Gordon ultimately told Carrera she knew how to get in touch with the homeowners and asked if she could call them. Carrera agreed to let her do so.

Using a cell phone, Gordon dialed a number and spoke to someone for a short while. Gordon then handed the phone to Officer Carrera. According to Officer Carrera, the person on the other end of the line was a man who denied being the owner of the residence. Officer Carrera handed the phone back to Gordon and said "I need to speak to the homeowner." Id. at 336. Gordon spoke to the man on the phone for an additional time period and, at the conclusion of her conversation, asked Officer Carrera if she could make another call. Officer Carrera agreed to let her do so. Gordon dialed a second number, spoke briefly, then handed the phone to Carrera and indicated that the homeowner was on the other end of the line. Officer Carrera asked the woman on the phone if she was the owner of the residence at 3244 Cleveland. The woman said "yes," and identified herself as Jami Mosley. Officer Carrera asked Mosley if there should be individuals at the residence. Mosley answered affirmatively, stating that people were at her residence installing a fence. Officer Carrera told Mosley that she was at the residence because the alarm was going off. Mosley responded by saying "My alarm's going off? It shouldn't." Id. at 337. Officer Carrera asked Mosley whether Gordon and Cook had permission to be inside the residence. Mosley refused to answer and was insistent that she be allowed to speak to Gordon again. Officer Carrera handed the phone back to

Gordon.

During the ensuing conversation between Officer Carrera and Gordon, Gordon stated that she and Cook were allowed to use the restroom in the basement of the residence. Officer Carrera asked Gordon where in the basement the restroom was located. After receiving Gordon's response, Officer Carrera, still concerned that she had interrupted a burglary in progress, informed Officer Simms that she was going to go into the basement area of the residence to make sure everything was okay and to verify Gordon's statement.

Officer Carrera entered the residence, this time through the sliding glass door that leads from the driveway into the basement (i.e., the door that Cook was observed exiting when Officer Carrera initially arrived at the residence). Following Gordon's description of where the restroom was located, Officer Carrera took an immediate left and observed a small kitchen and counter area. As she was walking past that area in search of the restroom, Officer Carrera observed on the kitchen counter a clear plastic bag that appeared to contain a brick of marijuana. Turning to her left to leave the residence, Officer Carrera observed on the other side of the kitchen counter a trash bag that was wide open and contained what appeared to be more bricks of marijuana.

Based upon Officer Carrera's observations inside the residence, the KCKPD obtained a search warrant for the residence later that evening and executed it in the early morning hours of June 10, 2003. When Stephen Owen, a detective with the KCKPD, arrived at the scene to assist in the execution of the search warrant, he was approached

-6-

outside the residence by Mosley. Mosley told Owen that she was the owner of the residence and that she lived there with her children and her boyfriend, Alvarez McCullough. McCullough was present with Mosley outside the residence during the search.

During the search, the police found in the basement kitchen area the brick of marijuana on the counter and the trash bag full of marijuana bricks observed by Officer Carrera. Near the marijuana the police found various documents pertaining to both Mosley and McCullough. In the basement family room, the police found what they believed to be residue of crack cocaine. In the main floor kitchen area, the police found (a) a shoe box containing a digital scale covered with some sort of white powder, several plastic baggies with a white substance inside them, and a baggie containing what appeared to be marijuana, (b) a glass, sauce-type pan with white residue on the inside and outside, (c) a grocery bag containing what appeared to be marijuana, (d) a plastic baggie containing what appeared to be powder cocaine, (e) a baggie containing what appeared to be crack cocaine, and (f) a fully loaded Ruger P-90 handgun. In the main floor hallway closet, the police found two white cylinders of cocaine wrapped in plastic, plus $3,240 in cash. In the master bedroom, the police found $2,767 in cash spread out over the bed, as well as photos and documents belonging to Mosley and McCullough (in particular a driver's license belonging to Mosley, and a Kansas state identification card belonging to McCullough). In the first of two master bedroom closets, the police found women's clothing, additional marijuana, and a handgun. In the second of the master bedroom

closets, the police found men's clothing, a fully-loaded, semi-automatic assault rifle, and a fully-loaded, 20-gauge, pistol-grip Mossberg shotgun.

Following additional investigation, Mosley and McCullough were indicted by a federal grand jury on charges of: (1) conspiracy to distribute and possess with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine and fifty grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(iii), (ii)(II), and 846; (2) possession with intent to distribute five grams or more of a mixture and substance containing a detectable amount of cocaine base, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(iii); (3) possession with intent to distribute five hundred grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii)(II); (4) possession with intent to distribute a detectable amount of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (D); and (5) possession of a firearm (i.e., a Mossberg 20-gauge shotgun, a Smith and Wesson .38 caliber handgun, a DPMS semiautomatic assault rifle, and a Ruger .45 caliber handgun) in furtherance of a drug trafficking crime (i.e., possession with intent to distribute cocaine, cocaine base and marijuana), in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (c)(1)(B)(ii). Mosley was also indicted on one count of managing and controlling, as an owner, a residence for the purpose of unlawfully storing and distributing cocaine, cocaine base and marijuana, in violation of 21 U.S.C. § 856(a)(2).

The case initially proceeded to trial in late October of 2004. On November 1,

2004, the district court declared a mistrial because the jury was unable to reach a unanimous verdict. A second trial began on November 12, 2004. At the conclusion of all the evidence, the jury found Mosley guilty on Count 1 (conspiracy) and 6 (managing and controlling a residence for the purpose of drug trafficking), and McCullough guilty on Counts 1 (conspiracy), 3 (possession with intent to distribute five hundred grams or more of cocaine), 4 (possession with intent to distribute marijuana), and 5 (possession of a firearm during and in relation to a drug trafficking crime).

Because the case was tried after the decision in Blakely v. Washington, 542 U.S. 296 (2004), but before the decision in United States v. Booker, 543 U.S. 220 (2005), the district court elected to submit to the jury, for a decision utilizing the "beyond a reasonable doubt" standard, the sentencing enhancements alleged by the prosecution. Based upon the evidence presented to them, the jury found that Mosley engaged in obstruction of justice with respect to her counts of conviction (i.e., by lying under oath at trial), but did not possess a firearm in connection with her role in the conspiracy. As for McCullough, the jury found that he acted as an organizer, manager or leader in the conspiracy and possessed firearms in connection with three of the offenses of conviction.

The district court sentenced Mosley to the statutory minimum sentence of 120 months' imprisonment, a sentence well below the advisory guideline range of 188 to 235 months. As for McCullough, the district court sentenced him to a term of imprisonment of 380 months.

II.

***A.  Mosley's Appeal***

In her appeal, Mosley asserts three challenges to her convictions: (1) that the evidence was insufficient to support her conspiracy conviction; (2) that the verdicts were inconsistent and the evidence insufficient to support her conviction for maintaining a residence for the purpose of storing cocaine; and (3) that her counts of conviction are multiplicitous.  For the reasons outlined below, we find no merit to any of these arguments and therefore affirm Mosley's convictions.

*Sufficiency of evidence - conspiracy*

Mosley first contends that the evidence presented at trial was insufficient to support her conspiracy conviction.  "Sufficiency of the evidence is a legal issue we review de novo."  United States v. Green, 435 F.3d 1265, 1272 (10th Cir. 2006).  In reviewing the sufficiency of the evidence, we "ask only whether taking the evidence . . . together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt."  Id. (internal quotation marks omitted).

"A conspiracy in violation of 21 U.S.C. § 846 consists of four elements."  United States v. Montelongo, 420 F.3d 1169, 1173 (10th Cir. 2005).  "The government must prove beyond a reasonable doubt (1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators."  Id. (internal

-10-

quotation marks omitted).

Here, Mosley does not precisely identify which of these elements she is challenging. Instead, she argues that the evidence establishing that she owned and lived at the residence at 3244 Cleveland and was present at times when McCullough sold drugs was insufficient to establish that she was an active member of a conspiracy with McCullough. She also argues that the government failed to present any evidence that she (a) personally handled, concealed or was entrusted in safekeeping any drugs, (b) knew firearms were in her residence or that they were used in any drug transactions, (c) knew her residence was being used for storage of narcotics, (d) purchased any supplies for the packaging of drugs, (e) sold, picked up or repackaged any drugs, or (f) was paid any money by McCullough for participation in a drug conspiracy.

*1) Existence of an agreement with McCullough to violate the law*

In determining whether there was an agreement to commit an unlawful act, "[t]he critical inquiry is whether the circumstances, acts, and conduct of the parties [we]re of such a character that the minds of reasonable men may conclude therefrom that an unlawful agreement exist[ed]." United States v. Morehead, 959 F.2d 1489, 1500 (10th Cir. 1992) (internal quotation marks omitted). The existence of an agreement to violate the law "may be inferred from the facts and circumstances of the case." United States v. Evans, 970 F.2d 663, 669 (10th Cir. 1992).

It is true there was no evidence in this case that Mosley directly participated in drug trafficking by obtaining drugs or firearms, transforming powder cocaine into crack

cocaine, or selling drugs at her residence. Nevertheless, our review of the trial transcript leads us to conclude that the evidence presented by the government was more than sufficient to establish a reasonable inference that there was an agreement between Mosley and McCullough that McCullough would use Mosley's residence[1] for the purposes of drug-trafficking. The police who searched the residence found large quantities of cocaine and marijuana in various parts of the house, including the main kitchen area (that the jury reasonably could have inferred that Mosley used on a regular basis), a hallway closet (where Mosley kept items belonging to her children) and the master bedroom (including the closet where Mosley kept her clothing). Likewise, the police found four firearms in the house, including one that was stored in Mosley's master bedroom closet, as well as large amounts of cash both in the hallway closet and the master bedroom. In addition to the evidence seized from the home, the government presented several witnesses who testified to purchasing drugs, in some cases in substantial quantities, from McCullough at Mosley's residence while Mosley and her children were present there. Finally, Mosley, who was a full-time student and had no major source of income for herself or her children, admitted at trial that she received money on a regular basis from McCullough (although she testified it was for purposes of child support), and it was uncontroverted that she drove at least one vehicle supplied to her by McCullough.

---

[1] Although the government's evidence indicated that McCullough kept personal belongings at Mosley's residence and stayed there on a regular basis, it also established that McCullough owned a separate residence in Kansas City, Kansas, where he sometimes stayed and also conducted drug transactions.

*2) Knowledge of the essential objectives of the conspiracy*

Based upon the evidence described above, we conclude the jury could reasonably have found that Mosley was well aware of the essential objectives of the conspiracy, i.e., to possess and distribute for profit cocaine powder, cocaine base, and marijuana. Indeed, it is difficult to imagine that Mosley could have lived in the house without being aware of the presence of large quantities of drugs, cash, and deadly weapons, or the frequent visits from strangers who engaged in transactions with McCullough.

*3) Knowing and voluntary involvement*

We further conclude, again based upon the evidence described above, as well as Mosley's admitted relationship with McCullough, that the jury could reasonably have found that Mosley was a knowing and voluntary participant in the charged conspiracy. More specifically, we conclude the jury could reasonably have found that Mosley knowingly and voluntarily allowed McCullough to use her home for purposes of drug-trafficking.

*4) Interdependence*

"Interdependence exists where each coconspirators' activities constituted essential and integral steps toward the realization of a common, illicit goal." United States v. Edwards, 69 F.3d 419, 432 (10th Cir. 1995) (internal quotation marks omitted). Here, the evidence presented at trial established that Mosley supplied a reasonably safe and secure residence for McCullough to use for engaging in drug trafficking activities. In turn, McCullough accomplished the goal of the conspiracy by obtaining and reselling at the

residence cocaine and marijuana.

In sum, we conclude the evidence presented by the government at trial was sufficient to support Mosley's conspiracy conviction.

*Sufficiency of evidence - managing residence in violation of § 856(a)(2)*

Mosley next contends that the jury's decision to convict her of violating 21 U.S.C. § 856(a)(2) (Count 6) was inconsistent with its decision to acquit her of the substantive drug counts charged in Counts 2 through 5. More specifically, Mosley argues "[i]t [wa]s highly inconsistent to convict[] her of maintaining and controlling a residence on June 9, 2003 – which require[d] her to have knowledge that drugs were in her house on that day – while acquitting her of knowingly possessing drugs on June 9, 2003." Mosley Br. at 23. Thus, Mosley argues, there was insufficient evidence to support her § 856(a)(2) conviction and the district court should have granted her motion for judgment of acquittal.

To convict Mosley of violating 21 U.S.C. § 856(a)(2) as alleged in the indictment, the jury had to find that she (1) managed and controlled the residence at 3244 Cleveland (2) as an owner and (3) knowingly and intentionally made the residence available for use for the purpose of unlawfully storing and distributing cocaine, cocaine base and marijuana. United States v. Prentiss, 206 F.3d 960, 975 (10th Cir. 2000); United States v. Chen, 913 F.2d 183, 187 (5th Cir. 1990). Mosley admitted that she owned the residence and thereby effectively managed and controlled it by living in it as her primary residence. Further, based upon the evidence already discussed, we conclude the jury could reasonably have inferred that Mosley knowingly and intentionally made the residence

-14-

available to McCullough for purposes of his drug-trafficking activities.

Notably, these essential elements did not require the government to prove either that drugs were present in the residence on June 9, 2003 (although that was firmly established) or that Mosley was aware that drugs were present in the residence on that date. Thus, the jury's acquittal of Mosley on Counts 2 through 5 (each charging her with possession of narcotics with intent to distribute on June 9, 2003) was not inconsistent with its conviction of Mosley on the § 856(a)(2) charge. That is, the jury could reasonably have concluded that Mosley, who was in the late stages of pregnancy on June 9, 2003, had, as she testified at trial, been staying with friends during late May and early June of 2003, and thus was unaware of the various drugs found in and seized from the residence on June 9, 2003, yet nevertheless knowingly and intentionally made the residence available to McCullough on that date for purposes of his drug-trafficking activities.[2]

*Multiplicitous counts*

In her final argument, Mosley contends that her two counts of conviction "are multiplicitous because they each rely on the same facts." Mosley Br. at 23. "We ordinarily review claims of multiplicity de novo, but where," as here, "a defendant fails to

---

[2] In any event, consistency in verdicts is not required because, "where truly inconsistent verdicts have been reached, 'the most that can be said is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt.'" United States v. Powell, 469 U.S. 57, 64-65 (1984) (quoting Dunn v. United States, 284 U.S. 390, 393 (1932) (alterations omitted.)

raise the issue in a pre-trial motion," we "review only for plain error."  United States v. Graham, 305 F.3d 1094, 1100 (10th Cir. 2002) (internal citations and quotation marks omitted).  "Under the plain error standard, [Mosley] must show clear or obvious error that affected h[er] substantial rights and seriously affected the integrity of the judicial proceedings."  Id. (internal quotation marks omitted).

"Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior."  United States v. Johnson, 130 F.3d 1420, 1424 (10th Cir. 1997). Although "multiplicity is not fatal to an indictment," id. (internal quotation marks omitted), multiplicitous counts which may result in multiplicitous convictions are considered "improper because they allow multiple punishments for a single criminal offense,"  United States v. Jenkins, 313 F.3d 549, 557 (10th Cir. 2002).  This court's "jurisprudence establishes that multiplicitous sentences violate the Double Jeopardy Clause."  United States v. Morris, 247 F.3d 1080, 1083 n.2 (10th Cir. 2001).

The test for multiplicity "is whether the individual acts [alleged in the counts at issue] are prohibited, or the course of [conduct] which they constitute."  Graham, 305 F.3d at 1100 (internal quotation marks omitted).  "If the former, then each act is punishable separately.  If the latter, there can be but one penalty."  Id. (internal quotation marks omitted).  Where multiplicitous convictions are found, "the only remedy . . . is . . . to vacate one of the underlying convictions as well as the . . . sentence based upon it . . . ." Rutledge v. United States, 517 U.S. 292, 301-02 (1996) (internal quotation marks omitted).

-16-

We have repeatedly held that the "commission of a substantive offense and a conspiracy to commit it are separate crimes because the essence of a conspiracy charge is an agreement to commit a substantive offense." United States v. Johnson, 977 F.2d 1360, 1371 (10th Cir. 1992) (internal quotation marks, italics, and alterations omitted). Thus, for example, we "have held that Congress intended to allow imposition of separate sentences for a conspiracy conviction under 21 U.S.C. § 846 and for the substantive drug offenses that form the object of the conspiracy." Id. (citations omitted).

In United States v. Sturmoski, 971 F.2d 452 (10th Cir. 1992), and later in Johnson, we held that convictions under 21 U.S.C. § 846 and §§ 856(a)(1) and (a)(2) are not multiplicitous because the plain language and legislative history of § 856 "demonstrate[] that . . . Congress unequivocally determined to create a distinct offense – with its own, separate punishment – aimed specifically at criminalizing the use of property for narcotics-related purposes." Sturmoski, at 461; see Johnson, 977 F.2d at 1375. Those holdings clearly control here, where Mosley was convicted of violating §§ 846 and 856(a)(2). Thus, we conclude that Mosley's counts of conviction are not multiplicitous.

**B. McCullough's Appeal**

In his appeal, McCullough challenges both his convictions and sentence. More specifically, McCullough contends (1) the district court erred in denying his motion to suppress evidence seized during the search of the residence at 3244 Cleveland, (2) the district court erred in denying his motion for new trial based upon newly discovered evidence, (3) the district court erred in denying his motion for judgment of acquittal on

Counts 3, 4 and 5, and (4) the sentence imposed by the district court was unreasonable because the district court failed to take into account the disparity in punishment between defendants convicted of trafficking in crack cocaine and those convicted of trafficking in powder cocaine. For the reasons discussed below, we conclude there is no merit to any of McCullough's contentions, and we therefore affirm his convictions and sentence.

*Denial of motion to suppress*

McCullough contends the district erred in denying his motion to suppress evidence seized during the search of the residence at 3244 Cleveland. When reviewing the denial of a motion to suppress, we consider the evidence in the light most favorable to the government, and accept the district court's factual findings unless they are clearly erroneous. United States v. Herrera, 444 F.3d 1238, 1242 (10th Cir. 2006). "The ultimate determination as to whether an officer's conduct violates the Fourth Amendment, however, is reviewed de novo." United States v. Lopez, 443 F.3d 1280, 1283 (10th Cir. 2006).

"The Fourth Amendment says that the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'" Illinois v. McArthur, 531 U.S. 326, 330 (2001) (quoting U.S. Const., Amdt. 4). "Its 'central requirement' is one of reasonableness." Id. (quoting Texas v. Brown, 460 U.S. 730, 739 (1983)). "It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." Payton v. New York, 445 U.S. 573, 586 (1980) (internal quotation marks omitted).

-18-

However, "[w]hen faced with special law enforcement needs, diminished expectations of privacy, minimal intrusions, or the like, the [Supreme] Court has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable." McArthur, 531 U.S. at 330. "Special law enforcement needs" have been held to exist, and thus allow the police to conduct a warrantless search, where the police "have probable cause to search the area in question and exigent circumstances exist to make the warrant requirement impractical." United States v. Edwards, 242 F.3d 928, 939 (10th Cir. 2001). Even in such situations, however, the scope of the warrantless search is "'strictly circumscribed by the exigencies which justif[ied] its initiation . . . .'" Mincey v. Arizona, 437 U.S. 385, 393 (1978) (quoting Terry v. Ohio, 392 U.S. 1, 25-26 (1968)).

In this case, the district court concluded "that the active burglar alarm, combined with other evidence [found] at the scene [of the residence at 3244 Cleveland], created an exigency that justified Officer Carrera's warrantless entries into the home." McCullough App., Vol. 1 at 36. In his appeal, McCullough argues there was no need for Officer Carrera's initial entry because "she had already received a reasonable explanation from Gordon that she was working on a privacy fence," and this explanation was effectively verified "because of the obvious construction in the yard and the fact Gordon and Cook were dirty from the construction of the fence." McCullough Br. at 24. McCullough further argues that, "[e]ven if the initial entry into the residence was permitted in order to check the burglar alarm," Officer Carrera's "renewed entry and search of the basement without a warrant was not supported by exigent circumstances." Id. at 16. According to

McCullough, "Officer Carrera received a logical explanation from Gordon as to her presence at the residence and why the alarm was triggered and that explanation was corroborated by a phone call to Mosely [sic]." Id. at 16-17. In sum, McCullough argues, "it was clear that a burglary was not in progress and the fruits from Officer Carrera's search of the residence should have been suppressed." Id. at 17.

Notably, McCullough does not dispute that a police officer responding to an alarm, such as Officer Carrera, can conduct a search if he or she reasonably suspects that a burglary or some other type of crime is in progress. Although we have never directly addressed the issue, our sister circuits appear to unanimously agree, and reasonably so in our view, "that an officer may lawfully enter a residence without a warrant under the exigent circumstances exception when the officer reasonably believes a burglary is in progress." United States v. Brown, 449 F.3d 741, 748 (6th Cir. 2006); see United States v. Johnson, 9 F.3d 506, 509 (6th Cir. 1993) (citing and discussing cases from various circuits). Thus, the question at issue here is whether the factual circumstances confronting Officer Carrera were sufficient to give her probable cause to believe that a burglary was in progress at the residence at 3244 Cleveland.

Although McCullough argues otherwise, we conclude that Officer Carrera had a particularized and objective basis for concluding that there was "a probability or substantial chance" that a burglary was in progress at 3244 Cleveland and that Gordon and Cook were involved in that burglary. Illinois v. Gates, 462 U.S. 213, 245 (1983) (defining probable cause); see generally United States v. Concepcion-Ledesma, 447 F.3d

-20-

1307, 1316 (10th Cir. 2006) (discussing de novo review of probable cause determination).

When she was initially dispatched to the residence, Officer Carrera was informed that a security alarm had been triggered at the residence. Thus, in accordance with KCKPD protocol, Officer Carrera's responsibility was to respond to the residence in order to investigate and, if the alarm was cancelled, to make sure that the actual homeowner was responsible for the cancellation. Upon her arrival at the residence, Officer Carrera was confronted with two people who were unusually dirty in appearance, did not have any form of personal identification, were admittedly not the homeowners, did not know the name of the homeowner, and were acting in a nervous manner. Further, one of the two people (i.e., Cook), was observed leaving the residence when Officer Carrera arrived, did not make any attempt to speak to her, and was acting disoriented. Taking into account all of these circumstances, we conclude that Officer Carrera's initial warrantless entry into the residence to check the status of the security alarm panel was justified by exigent circumstances.

Further, neither Officer Carrera's checking of the security alarm panel, nor the events that ensued thereafter, could reasonably have served to lessen her suspicion that a crime was in progress. Although Gordon told Officer Carrera that she had spoken to the homeowner and reset the alarm, Officer Gordon concluded otherwise when she inspected the security alarm panel. As noted, Officer Gordon determined that the alarm panel had not, in fact, been reset, and was still indicating that there had been a disturbance of the

-21-

front door and motion detectors.[3]  When Officer Carrera thereafter allowed Gordon to contact the homeowner by cell phone, Gordon first put Officer Carrera in touch with a man who denied being the homeowner.  Gordon then made a second call and this time put Officer Carrera in touch with a woman who purported to be the homeowner.  However, the woman seemed to act surprised when informed that her alarm was going off (despite Gordon allegedly having already spoken to her about the problem) and refused to respond to Officer Carrera's question about whether Gordon and Cook had authority to be inside the residence.  We readily agree with the district court that, "[r]ather than corroborating the existence of a false alarm, these events only increased Officer Carrera's suspicion and once against justified further investigation."  McCullough App., Vol. 1 at 41.

Lastly, we agree with the district court that these circumstances gave Officer Carrera "reasonable grounds to believe there was an immediate need to protect the . . . property of the homeowner . . . ."  Id. at 42.  In other words, in addition to having probable cause to believe a burglary was in progress, the circumstances provided Officer Carrera with a reasonable basis for concluding that the warrant requirement was impractical.  Had she left the scene to obtain a warrant, Officer Carrera clearly risked allowing a potential burglary to continue, thereby placing the contents of the residence at 3244 Cleveland at issue, and likely allowing the two obvious burglary suspects to flee.

---

[3] At the hearing on his motion to suppress, McCullough attempted to establish that Officer Carrera re-triggered the alarm when she entered the residence.  The district court found that, regardless of whether that was true, it was uncontroverted that Officer Carrera was unaware of this fact and instead subjectively believed that Gordon had falsely claimed that the alarm had been reset.

In sum, we conclude the district court properly denied McCullough's motion to suppress.

*Denial of motion for new trial - newly discovered evidence*

At trial, the government, as part of its case-in-chief, presented testimony from five convicted felons (Edward Carvin, Marlon Hayes, Arnold Moore, Corey Williams, and Dominic Hayes), all of whom had pled guilty to drug-related crimes, were incarcerated at the same correctional facility in Kansas (apparently a facility operated by Correctional Corporation of America (CCA)), and were testifying on behalf of the government as part of their respective plea agreements. All five of these witnesses testified to having traveled to the residence at 3244 Cleveland to obtain drugs, and three of the five (Edward Carvin, Arnold Moore, Dominic Hayes) testified to having actually entered the house and directly purchased drugs from McCullough. Indeed, two of these three (Arnold Moore and Dominic Hayes) testified to having purchased substantial quantities of drugs from McCullough (i.e., Moore testified that he purchased cocaine from McCullough more than thirty times; Dominic Hayes testified that he likewise purchased substantial amounts of cocaine from McCullough, as well as between 250 to 300 pounds of marijuana).

On March 18, 2005, approximately four months after he was convicted, McCullough sent a letter to the district court stating that he had "discovered from inmates" at a CCA facility where he was being held pending sentencing that these five government witnesses had conspired to provide false testimony at trial against him and Mosley. Attached to McCullough's letter were written statements from nine inmates

confined at the same CCA facility (but not any of the five government witnesses who testified against him). As the district court subsequently noted,

> the statements of these inmates, taken together, suggested that the inmates had overheard the five cooperating witnesses conspiring to provide false testimony at trial in order to receive downward departures; that the inmates had been offered to "buy" information concerning Mr. McCullough's case to enable the inmate to testify at trial and thereby receive a downward departure; and that some of the government's cooperating witnesses were "selling" information about Mr. McCullough's case so that other inmates could "jump on" the case and receive a downward departure.

McCullough App, Vol. 1 at 127. On April 5, 2005, McCullough, through counsel, filed a formal motion for new trial based upon this purported "newly discovered evidence." Id. at 108.

The district court held a multi-day evidentiary hearing on the motion in early May 2005. During the hearing, McCullough presented testimony from six of the nine inmates who had previously provided him with written statements, and the government presented each of the five cooperating witnesses who had testified for the government at trial. Following the hearing, the district court issued a lengthy memorandum and order denying McCullough's motion for new trial. In doing so, the district court noted that, "[f]or a variety of reasons," it did not believe most of the testimony provided by McCullough's witnesses. Id. at 133. "In some instances," the district court noted, "the substance of the testimony provided by defendants' witnesses simply defie[d] all common sense and, thus, lack[ed] credibility." Id. at 133-34. "Other testimony," the district court noted, "contradicted certain extrinsic evidence and, for that reason, [was] not credible." Id. at

-24-

134. "In other instances," the district court found, "defendants' witnesses contradicted each other on key facts, rendering the testimony unworthy." Id. "Finally," the district court found, "based on the totality of the evidence presented at the hearing, . . . that if any conspiracy to present false testimony existed, . . . it was initiated at the direction of . . . McCullough and was carried out at the evidentiary hearing before th[e] court." Id. More specifically, the district court found "that defendants' witnesses agreed to provide written statements to . . . McCullough and to testify at the hearing" for one of three reasons: out of "personal loyalty to . . . McCullough (the evidence at the hearing demonstrated that most, if not all, of defendants' witnesses were close associates of . . . McCullough's)," "based on a strong dislike for those inmates that choose to cooperate with the government," "or based on some combination of these two motivations." Id. at 145. The district court also found that McCullough "ha[d] a history of obstructing justice by conspiring to present false testimony," id. at 148, and actively sought "written statements from inmates [in this matter] regardless of whether those inmates had any personal knowledge regarding the truthfulness of the cooperating witnesses' testimony at trial." Id. at 147. Ultimately, the district court found that no conspiracy existed among the five cooperating government witnesses.

In his appeal, McCullough contends the district court erred in denying his motion for new trial. According to McCullough, a "jury should have heard" the evidence presented at the evidentiary hearing "and should have made th[e] credibility judgement [sic]; not the judge." McCullough Br. at 31.

"A motion for a new trial based on newly discovered evidence is not favorably regarded and should be granted only with great caution." United States v. Combs, 267 F.3d 1167, 1176 (10th Cir. 2001) (internal quotation marks omitted). To prevail on such a motion, a defendant must prove:

> "(1) the evidence was discovered after trial, (2) the failure to learn of the evidence was not caused by [his] own lack of diligence, (3) the new evidence is not merely impeaching, (4) the new evidence is material to the principal issues involved, and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal."

United States v. LaVallee, 439 F.3d 670, 700 (10th Cir. 2006) (quoting United States v. Quintanilla, 193 F.3d 1139, 1147 (10th Cir. 1999)). The denial of a motion for new trial based on newly discovered evidence is reviewed for abuse of discretion. Combs, 267 F.3d at 1176. A district court abuses its discretion when its decision is "arbitrary, capricious, whimsical, or manifestly unreasonable." Id. (internal quotation marks omitted).

In ruling on McCullough's motion, the district court in this case concluded that McCullough had satisfied the first four of the five prongs necessary for obtaining a new trial (i.e., that the evidence was discovered after trial, McCullough's failure to learn of the evidence was not caused by his own lack of diligence, the new evidence was not merely impeaching, and the new evidence was material to the principal issues involved in the case). Importantly, however, the district court also concluded that McCullough had failed to satisfy the fifth prong of the test, i.e., establishing that the new evidence was of such a nature that in a new trial it would probably produce an acquittal. Although the district

-26-

court agreed that the new evidence, "if believed, would probably produce an acquittal," McCullough App., Vol. 1 at 129, it expressly found, based on the reasons outlined above, that the new evidence was not credible and "that no . . . conspiracy existed in this case." Id. at 133.

After examining the record on appeal, we conclude the district court did not abuse its discretion in denying McCullough's motion. Notably, McCullough does not attempt to challenge the district court's factual findings or its credibility determinations. Instead, he effectively argues, without any citation to supporting authority, that the district court was required to accept his proffered evidence as true, order a new trial, and allow a new jury to determine whether the proffered evidence was credible. Neither the case law from this circuit, nor for that matter the case law from any other circuit, supports such a position. To the contrary, our five-pronged test, which we outlined above, clearly implies that the district court is to serve as a gatekeeper to a new trial, deciding in the first instance whether the defendant's proffered "new evidence" is credible. See also United States v. Gonzalez, 933 F.2d 417, 447 (7th Cir. 1991) (holding that, in order to grant a new trial on the grounds that a material witness lied at trial, a district court must be satisfied that the witness's testimony was false). Moreover, the position asserted by McCullough is patently absurd, since it would allow a defendant to automatically obtain a new trial, and thereby undermine the time and resources devoted to the initial trial, simply by manufacturing some type of "newly discovered evidence," no matter how incredible such new evidence might be.

*Denial of motion for judgment of acquittal - Counts 3-5*

McCullough contends the evidence presented at trial was insufficient to support his convictions on Counts 3 through 5, and thus the district court erred in denying his motion for judgment of acquittal on those counts. As previously noted, "[s]ufficiency of the evidence is a legal issue we review de novo." Green, 435 F.3d at 1272; see also United States v. Apperson, 441 F.3d 1162, 1209 (10th Cir. 2006) (noting that a district court's denial of a defendant's motion for judgment of acquittal is reviewed de novo). In reviewing the sufficiency of the evidence, we "ask only whether taking the evidence . . . together with the reasonable inferences to be drawn therefrom – in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." Green, 435 F.3d at 1272 (internal quotation marks omitted).

*1) Counts 3 and 4 - possession with intent to distribute cocaine and marijuana*

Count 3 charged McCullough with possession with intent to distribute five hundred grams or more of a mixture and substance containing a detectable amount of cocaine, in violation of 21 U.S.C. § 841(a)(1). Count 4 charged McCullough with possession with intent to distribute a detectable amount of marijuana, in violation of 21 U.S.C. § 841(a)(1). In order to convict McCullough of these charges, the government had to prove that he: "(1) possessed the controlled substance[s]; (2) knew he possessed the controlled substance[s]; and (3) intended to distribute or dispense the controlled substance[s]." United States v. Bowen, 437 F.3d 1009, 1014 (10th Cir. 2006) (internal quotation marks omitted). In challenging the sufficiency of the evidence supporting these

convictions, McCullough focuses solely on the first of these elements, i.e., possession. In particular, McCullough argues that "no evidence was presented that [he] was a co-owner of the residence" where the narcotics were found. McCullough Br. at 38. "In fact," McCullough argues, the evidence indicated that he "own[ed] his own residence at 3315 Webster" in Kansas City, Kansas. Id. Further, McCullough argues, "[n]o testimony was offered that [he] knew drugs were located in the home" at 3244 Cleveland. Id. at 39.

Possession of a controlled substance can be either actual or constructive. See United States v. McKissick, 204 F.3d 1282, 1291 (10th Cir. 2000). Constructive possession exists where "a person knowingly has ownership, dominion[,] or control over the narcotics and the premises where the narcotics are found." United States v. Reece, 86 F.3d 994, 996 (10th Cir. 1996) (internal quotation marks omitted). We have alternatively defined constructive possession of a controlled substance as "an appreciable ability to guide the destiny of the drug." United States v. Carter, 130 F.3d 1432, 1441 (10th Cir. 1997) (internal quotation marks omitted).

Applying these principles here, we conclude, after reviewing the record on appeal, that the government presented sufficient evidence to establish that McCullough had constructive possession of the cocaine and marijuana found in the residence at 3244 Cleveland. Although there was no evidence that McCullough had an ownership interest in the residence, the government's evidence established that McCullough had a long-term, intimate relationship with Mosley, the owner of the residence, and stayed at the residence on a regular basis. For example, Detective Stephen Owen, who assisted in the

search of the residence, testified at trial that when he arrived at the residence on the evening of June 9, 2003, Mosley approached him and, in the course of the ensuing conversation, explained that she lived at the residence with her children and McCullough, who she identified as her boyfriend. Detective James Bauer, who also assisted in the search, provided similar testimony.[4] The government's evidence also established that personal items and documents belonging to McCullough were found during the search of the residence. For example, a closet full of men's clothing and shoes was found in the master bedroom of the house (the other master bedroom closet contained women's clothing). Further, identification cards belonging to McCullough were found on top of the fireplace in the living room of the main floor, and on a computer table in the master bedroom. As for McCullough's connection to the narcotics found in the house, the government's evidence established that McCullough's fingerprints were found on a baggie containing cocaine residue seized from the residence's main floor kitchen. In addition, and perhaps most damaging to McCullough, was the testimony from the government's witnesses indicating that they had frequently purchased narcotics directly from McCullough at the residence. Together, this evidence, though circumstantial, was more than sufficient to establish McCullough's constructive possession of the cocaine and marijuana seized during the search of the residence.

---

[4] When Mosley testified in her own defense at trial, she denied that McCullough "lived" at the residence, but admitted he spent the night there two to three times a week.

*b) Count 5 - possession of firearm in furtherance of drug trafficking crime*

Count 5 charged McCullough with possession of four firearms (i.e., a Mossberg

20-gauge shotgun, a Smith and Wesson .38 caliber handgun, a DPMS semiautomatic

assault rifle, and a Ruger .45 caliber handgun) in furtherance of a drug trafficking crime,

in violation of 18 U.S.C. §§ 924(c)(1)(A)(i) and (c)(1)(B)(ii).  The jury found

McCullough guilty of possessing three of these four firearms (i.e., all but the Smith and

Wesson .38 caliber handgun).  McCullough App., Vol. 1 at 57.  The district court,

however, granted in part McCullough's post-trial motion for judgment of acquittal,

concluding the evidence was insufficient to support the jury's finding that McCullough

possessed a Ruger .45 caliber handgun in furtherance of a drug trafficking crime.[5]  Id. at

73.  The district court left intact the remaining findings of the jury regarding Count 5.

In his appeal, McCullough attacks these remaining findings supporting his

conviction on Count 5, arguing that the government failed to present sufficient evidence

to establish that his possession of the shotgun and assault rifle was "in furtherance of" a

drug trafficking offense.  In order to establish the "in furtherance of" element of a §

924(c)(1) charge, the government must "show that the weapon 'furthered, promoted or

advanced' a drug trafficking crime."  United States v. Robinson, 435 F.3d 1244, 1251

---

[5] The district court concluded that "the evidence presented at trial d[id] not support
the jury's finding that Mr. McCullough 'possessed' the Ruger .45 caliber handgun"
because "the government ha[d] not shown a sufficient nexus between Mr. McCullough
and this weapon."  McCullough App., Vol. 1 at 81.  In reaching this conclusion, the
district court noted that, "[u]nlike the other weapons that were found in Mr.
McCullough's own closet, the handgun was found in the kitchen – a multipurpose room
that was used by a variety of individuals, not just Mr. McCullough."  Id.

(10th Cir. 2006) (quoting United States v. Iiland, 254 F.3d 1264, 1271 (10th Cir. 2001)). This showing can be satisfied by evidence that the defendant intentionally kept a firearm available for use if needed during a drug transaction. Id. "Several factors may facilitate proof . . . of the defendant's intent." Id. These factors include: "(1) the type of drug activity being conducted, (2) the accessibility of the firearm, (3) the type of firearm, (4) the legal status of the firearm, (5) whether the firearm is loaded, (6) the proximity of the firearm to drugs or drug profits, and (7) the time and circumstances under which the firearm is found." Id.

After reviewing the trial transcript, we conclude the government's evidence was more than sufficient to allow the jury to reasonably find that McCullough intentionally kept the shotgun and assault rifle available for use during drug transactions if needed. To begin with, both weapons were easily accessible, both having been found in plain view in the master bedroom closet that contained men's clothing and footwear, and just down the hallway from the main floor kitchen where the bulk of the drug transactions occurred.[6] According to the government's evidence, the shotgun, which had a pistol grip, was not of the type that could reasonably be used for hunting or sporting purposes. Rather, its primary use was for home protection. Although the government's evidence indicated that

[6] One of the government's witnesses, Dominic Hayes, testified that, during a drug transaction, McCullough left the main floor kitchen and walked to the back of the main floor (i.e., towards the hallway and master bedroom) to obtain the drugs to complete the transaction. Based upon this testimony, and in combination with the evidence seized from the house, the jury could reasonably have determined that McCullough used the hallway closet and the master bedroom as primary storage areas for his narcotics.

the assault rifle could, in theory, have been used for hunting, its primary hunting use would have been for large game, and there was no evidence to support that use in this case. Neither weapon was registered in McCullough's name (or Mosley's name). Both weapons were fully loaded and thus available for easy use if needed. Finally, hundreds of thousands of dollars worth of narcotics were found in the house (including marijuana that was found in the same closet where the two firearms were stored, and large bricks of cocaine that were stored in a hallway closet just outside the master bedroom), and the government's evidence established that McCullough routinely sold large quantities of narcotics from the house. Considering all of these facts together, the evidence was more than sufficient to establish the "in furtherance of" element.

*Reasonableness of sentence*

At the time of sentencing, McCullough made "a general objection . . . to the extreme disparity that is afforded crack cocaine pursuant to the [Sentencing] guidelines." McCullough App., Vol. 3 at 545. More specifically, McCullough argued that there was no "legitimate basis" for the harsher treatment imposed under the Sentencing Guidelines for crimes involving crack cocaine versus those involving powder cocaine. Id. Accordingly, McCullough asked the district court "to show mercy on [him]" when it announced its sentence. Id. at 546. The district court overruled McCullough's objection and refused to depart from the advisory guideline range on this basis, stating as follows:

> Turn [sic] my attention to the objection concerning the crack/powder
> disparity. That is of less consequence here, of course, than it is in many
> cases because the great bulk of the drugs here were in the powder form;
> however, I do overrule the objection. This particular disparity has been

studied in great depth by the Sentencing Commission. It's been studied by Congress. There are differing points of view about it, but the weight of decision on this matter has been that that disparity is warranted not because it's discriminatory towards those who use these drugs – or those who sell the drugs, for that matter – but rather, in my view, because of the ease of marketability and ease of use of crack cocaine, making it a much more potent economic force and therefore creating even more of a difficulty in the drug world. I think there's a reasonable basis for the disparity, and I see no reason to conclude that it's based on any improper factor.

Id. at 557-58.

On appeal, McCullough now contends that the sentence imposed by the district court was unreasonable under 18 U.S.C. § 3553(a) and Booker because the district court failed to properly take into account "the substantial differences in sentencing between powder cocaine and crack cocaine and the fact that statistically speaking, African Americans are punished more severely than Whites based on the distinction between cocaine and cocaine base." McCullough Br. at 40.

"Under Booker, we are required to review district court sentencing decisions for 'reasonableness.'" United States v. Cage, 451 F.3d 585, 591 (10th Cir. 2006). "Sentencing decisions must be reversed when a sentence is unreasonable considering the factors enumerated in 18 U.S.C. § 3553(a)." Id. "Reasonableness has both procedural and substantive components." Id. (citing United States v. Kristl, 437 F.3d 1050, 1054-55 (10th Cir. 2006)). Because the sentence imposed by the district court in McCullough's case is within the advisory guideline range, and because McCullough does not challenge the district court's calculation of that range, the sentence imposed by the district court must be considered reasonable from a procedural perspective and, in turn, is considered

-34-

presumptively reasonable from a substantive perspective.  See Kristl, 437 F.3d at 1054-55.  Thus, the burden is on McCullough to rebut that presumption of substantive reasonableness.  See id. at 1055 (noting "[t]he defendant may rebut this presumption by demonstrating that the sentence is unreasonable in light of the other sentencing factors laid out in § 3553(a)").

McCullough, however, cannot satisfy this burden.  Prior to Booker, we, like all other circuits, consistently rejected challenges to the disparity in the Sentencing Guidelines between crack cocaine and powder cocaine.  E.g., United States v. Maples, 95 F.3d 35, 37-38 (10th Cir. 1996) (noting that Congress had voted to preserve the higher sentences for crack-related crimes, and that, accordingly, "the expansive issue of appropriate sentencing levels for crack offenses [wa]s not the sort of discrete, individual and case-specific mitigating circumstance[] justifying downward departure").  Although we have not had an opportunity to address the disparity issue since Booker, several other circuits have and all have agreed that a sentence is not rendered unreasonable merely because of a district court's refusal to deviate from the advisory guideline range on the basis of the crack cocaine/powder cocaine disparity.  See, e.g., United States v. Gipson, 425 F.3d 335, 337 (7th Cir. 2005) (concluding it was not error for district court to refuse to take the disparity into account in sentencing defendant); United States v. Cawthorn, 429 F.3d 793, 803 (8th Cir. 2006) ("hold[ing] sentencing within the Guidelines based on the crack-powder disparity is not inherently unreasonable").  Further, at least two circuits have held that it is error for a district court

to impose a sentence outside the advisory guideline range based upon its own disagreement with the crack cocaine/powder cocaine disparity. See United States v. Pho, 433 F.3d 53, 63 (1st Cir. 2006) (concluding that "district court's categorical rejection of the 100:1 ratio . . . runs headlong into the will of Congress as embodied in the Sentencing Reform Act," and "threatens to undermine th[e] desired uniformity" in federal sentences); United States v. Eura, 440 F.3d 625, 633 (4th Cir. 2006) (reversing sentence where district court, at time of post-Booker sentencing, substituted its own crack cocaine/powder cocaine ratio for the 100:1 ratio chosen by Congress) ("[G]iving a sentencing court the authority to sentence a defendant based on its view of an appropriate ratio between crack cocaine and powder cocaine would inevitably result in an unwarranted disparity between similarly situated defendants in direct contradiction to the specific mandate of 18 U.S.C. § 3553(a)(6)."). In light of this authority, with which we agree, we conclude that the district court in this case did not err in refusing to impose a lower sentence based on the disparity in the Guidelines' treatment of crack and powder cocaine.

The judgment of the district court is AFFIRMED.